IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEBRASKA

United States of America,

              Plaintiff;

           v.

2020 McLaren 600LT Spider;

2022 GMC Sierra-K2600 AT4 4x4;

2022 GMC Sierra-K2500 AT4 CC
4x4;

$74,743.00 United States
Currency;

Farmers NW Life Insurance Policy
Number 009138164;

Farmers NW Life Insurance Policy
Number 009165409;

Farmers NW Life Insurance Policy
Number 006704990V;

Zenith EL Primero Watch;

Hublot Bing Bang Watch;

Breitling Navitimer 43mm Watch;

Rolex Daytona Watch 116509
Serial Number 65S626F8 21749;

Rolex Oyster Perpetual Watch
Serial Number X64G6926
AF124300X6;

Case No. 8:22-CV-240

Rolex Oyster Perpetual Watch
Serial Number 259G7053 2831-
7351-4857;

18K Yellow Gold Hockey Goalie
pendant with diamonds and yellow
gold chain;

18K white gold adjustable chain
and four hearts solitaire pendants;

Rolex Oyster Perpetual Watch
Serial Number X5965319 22244;

18K Yellow Gold Hockey Player
pendant with diamonds and gold
chain;

18K White Gold Bull Rider
pendant with diamonds and chain;

18kt White Gold Wide Diamond
ring with sapphires;

18kt White Gold Ladys Ring with
sapphires and diamonds;

Rolex 40MM Oyster Perpetual
Daytona White Mop8 Watch Serial
Number C3J48934;

Astron SS CSHN Brace Watch;

¼ ctw DIA 18" station necklace;

8.30 ctw DIA 18KW necklace;

Rolex Oyster Perpetual Watch
Serial Number 179E626;

Breitling Aviator 8 Curtis
Warhawk Watch;

Omega Aqua Terra Limited
Edition Watch;

Omega Speedmaster Watch;

Omega Seamaster Watch;

Degrisogono Powerbreaker Watch;

17756 East Colt Drive, Queen Creek,
Arizona;

980 County Road W, Space 1146,
Fremont, Nebraska;

4859 South 136 Street, Omaha,
Nebraska;

50% Interest in 2203 23rd Street,
Columbus, Nebraska,

Defendants.

## COMPLAINT FOR FORFEITURE IN REM

Plaintiff, United States of America, by its attorneys, Kimberly C. Bunjer, Assistant United States Attorney, and Mikala Purdy-Steenholdt, Assistant United States Attorney, brings this complaint and alleges the following in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

## NATURE OF THE ACTION

1.    This is an action to forfeit property to the United States for violations of 18 U.S.C. § 981(a)(1)(A) and 18 U.S.C. § 981(a)(1)(C).

## THE DEFENDANTS IN REM

2.   The defendant real property known and numbered as follows:

a.   17756 East Colt Drive, Queen Creek, Arizona, with all its appurtenances, improvements, and attachments thereon, and is more fully described as: lot 95, of Dorada Estates, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, recorded in Book 1151 of Maps, Page 37 and amended in part, and together with all that real property as shown on the amended final plat of Dorada Estates Amend, according to Book 1271 of Maps Page 31, of Official Records.

b.   980 County Road W, Space 1146, Fremont, Nebraska, with all its appurtenances, improvements, and attachments thereon, and is more fully described as: Lot S-1146, Lake SKI-DI, In Woodcliff, a subdivision as surveyed, platted and recorded in Saunders County, Nebraska.

c.   4859 South 136 Street, Omaha, Nebraska, with all its appurtenances, improvements, and attachments thereon, and is more fully described as:   That part of the Southwest Quarter (SW1/4) of Section 34, Township 16 North, Range 11 East of the 6th P.M, Douglas County, Nebraska, described as follows: Commencing at the Northwest corner of said SW1/4; thence S00°41'09"E (assumed bearing), a distance of 1412.4 feet to the Point of Beginning; thence N89°10'51"E, a distance of 532.36 feet; thence S00°41'09"E on a line, 532.26 feet East of and parallel with the West line of said SW1/4 , a distance of 409.20 feet; thence S89°18'51"W, a distance of 532.26 feet to a point on the West line of said SW1/4; thence N00°41'09"W along the West line of said SW1/4, a distance of 409.20 feet to the Point of Beginning

LESS AND EXCEPT

A tract of land located in Southwest Quarter of the Southwest Quarter (SW1/4 SW1/4) of Section 34, Township 16 North, Range 11 East of the 6th PM, Douglas County, Nebraska, more particularly described as follows: Commencing at the Southwest corner of said Section 34; thence N03°04'54"W (assumed bearing), along the West line of said Section 34, a distance of 818.78 feet; thence N86°55'06"E, a distance of 33.00 feet to a point on the East right-of-way line of 168th Street, said point also being the Point of Beginning; thence N03°04'54"W, along

said East right-of-way line of 168th Street, a distance of 409.20 feet; thence N86°55'06"E, along said East right-of-way line of 168th Street, a distance of 17.00 feet to the Southwest corner of Lot 628, Stone Creek, a subdivision as surveyed and platted in said Section 34, Douglas County, Nebraska; thence S03°04'53"E, along a line 50.00 feet East of and parallel to said West line of Section 34, a distance of 409.20 feet to the Northwest corner of Lot 545, Stone Creek, said point also being on said East right-of-way line of 168th Street; thence S86°55'06"W, along said East right-of-way line of 168th Street, a distance of 17.00 feet to the Point of Beginning. Said tract of land contains an area of 6,957 Square feet, or 0.160 acres, more or less.

d.   50% Interest in 2203 23rd Street, Columbus, Nebraska Lot 1. Block 19, Phillips Third Addition to the City of Columbus, in Platte County, Nebraska.

LESS and EXCEPT that certain tract of land described as follows: Beginning at the Northwest Corner of said Lot 1, said point being on the Southerly existing Highway 30 Right of Way line; Thence Easterly a distance of 44.09 Feet along said Right of Way line to the Northeast Corner of said Lot 1; thence Southerly deflecting 089 Degrees, 21 Minutes, 54 Seconds right, a distance of 13.39 Feet along the East line of said Lot 1; thence Westerly deflecting 090 Degrees, 16 Minutes , 01 Seconds right, a distance of 44.09 Feet to a point on the West line of said Lot 1 ; Thence Northerly deflecting 089 Degrees, 43 Minutes, 59 Seconds right. a distance of 13.68 Feet along said line to the Northwest Corner of said Lot 1 to the Point of Beginning.

The defendant real property has not been seized. The United States does not request authority from the Court to seize the defendant real property at this time. The United States will, as provided by 18 U.S.C. § 985(b)(1) and (c)(1), post notice of this action and a copy of the Complaint on the defendant real property, and serve notice of this action on the defendant real property's owner, and any other person or entity who may claim an interest in the defendant real property, along

with a copy of this Complaint.  The United States may elect to file a Lis

Pendens as to the Defendant real property at any time.

3.      The defendant vehicles.  The United States is moving for injunctive relief to preclude any

further use of the vehicles listed below as well as any transfer of title to the following

vehicles:

      a.      The defendant 2020 McLaren 600LT Spider, VIN SBM13SAA5LW007680;

      b.      The defendant 2022 GMC Sierra-K2600 AT4 4x4 Red
VIN1GT49PEYXNF163905;

      c.      The defendant 2022 GMC Sierra-K2500 AT4 CC 4x4 Red
VIN#1GT49PEY5NF145456.

4.      The defendant cash in the amount of $74,743.00 seized on May 3, 2022, and currently in

the custody of the FBI;

5.      Proceeds of the life insurance policies listed below.  The United States is moving for

injunctive relief to freeze any of these funds wherever they may be located.  The policies

include:

      a.      The defendant Farmers NW Life Insurance Policy Number 009138164
face value of $1,000,000.00;

      b.      The defendant Farmers NW Life Insurance Policy Number 009165409
face value of $1,000,000.00;

      c.      The defendant Farmers NW Life Insurance Policy Number 006704990V
face value of $180,730.19;

6.      The defendant jewelry.  The United States is moving for injunctive relief to prohibit the

transfer, sale, use, or otherwise dissipation of the jewelry items listed below and not in

FBI custody.   The following items of jewelry include:

      a.      The defendant Zenith EL Primero watch Item Number 1ZNTH0007, in
FBI custody;

b.      The defendant Hublot Bing Bang watch Item Number WHBG0129, in FBI custody;

c.      The defendant Breitling Navitimer watch 43mm Item Number WBTG1778, in FBI custody;

d.      The defendant Rolex Daytona watch 116509 Serial Number 65S626F8 21749, in FBI custody;

e.      The defendant Rolex Oyster Perpetual watch 124300 Serial Number X64G6926 AF124300X6, in FBI custody;

f.      The defendant Rolex Oyster Perpetual watch 124300 Serial Number 259G7053 2831-7351-4857, in FBI custody;

g.      The defendant 18K Yellow Gold Hockey Goalie pendant with diamonds .54 cttw and 20" yellow gold franco 5mm chain, in FBI custody;

h.      The defendant 18K white gold adjustable chain and four hearts solitaire pendants 1.03 ct HS F/VS1 GIA 14465889, 1.01 ct HS F/VS2 GIA 14913989, 1.50 ct HS D/VS1 GAI 15181577, 1.51 ct HS D/VS1 GIA 15022459;

i.      The defendant Rolex Oyster Perpetual watch 124300 Serial Number X5965319 22244;

j.      The defendant 18K yellow gold hockey player pendant with .15 cttw diamonds 20" 5MM Franco Chain, in FBI custody;

k.      The defendant 18K white gold bull rider pendant w/ .06 cttw diamonds 20" 5mm Franco Chain, in FBI custody;

l.      The defendant 18kt white gold wide diamond ring sq cut diamonds 5.33 emerald cut sapphires 5.74 #13604;

m.      The defendant 18kt white gold ladys ring 5 oval saph 3.00 cts micro diamonds .60;

n.      The defendant Rolex 40MM Oyster Perpetual Daytona White Mop8 watch Item Number GAAZ003732, Serial Number C3J48934;

o.      The defendant Astron SS CSHN Brace watch Item Number GEAZ002261;

p.      The defendant ¼ ctw DIA 14KW 18" station necklace Item Number CGAZ002336;

q.      The defendant 8.30 ctw DIA 18KW necklace Item Number 510Z007405;

r.      The defendant Rolex 41MM 904L Oystersteel Swiss-made Rolex Oyster
        Perpetual watch style number GAAZ003817, Serial Number 179E626;

s.      The defendant Breitling Aviator 8 Curtis Warhawk watch with green dial,
        green military band Model# A133161AL1X1, Serial# 2989028, in FBI
        custody;

t.      The defendant Omega Aqua Terra Limited Edition watch, in FBI custody;

u.      The defendant Omega Speedmaster watch, in FBI custody;

v.      The defendant Omega Seamaster watch, in FBI custody;

w.      The defendant Degrisogono Powerbreaker watch, in FBI custody.

## JURISDICTION AND VENUE

7.   This Court has subject matter jurisdiction over an action commenced by the United States
     under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a). This
     Court has in rem jurisdiction over the defendant property pursuant to 28 U.S.C.
     § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this
     district.

8.   Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or
     omissions giving rise to the forfeiture occurred in this district, and pursuant to 28 U.S.C.
     § 1395(a), (b), and (c).

## GROUNDS FOR FORFEITURE

9.   The defendant properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A),
     because they constitute property involved in transactions or in attempted transactions in
     violation of sections 1956 or 1957 of Title 18, United States Code, or are properties
     traceable to such property.

10. The defendant properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), because they constitute or were derived from proceeds traceable to an offense constituting a "specified unlawful activity" as defined in Section 1956(c)(7) and 1961(1) of Title 18, United States Code, or a conspiracy to commit such offense. Such offenses include violations of 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud).

**FACTS**

11. On or about December 2019, IRS-CI Agents received a referral from its collection division alleging JEFF STENSTROM (STENSTROM) and STENSTROM SERVICES, INC. (SSI) evaded or attempted to evade the payment of approximately $2,000,000.00 in income related to the operation of SSI. SSI is wholly owned by STENSTROM and purports to be a commercial general contractor. The referral also noted a large portion of the net income derived by SSI was paid by STENSTROM to BRETT COOK (COOK).

12. Up until his death on May 4, 2022, COOK was the Vice-President of Darland Properties (Properties). Properties is a property management company that collects rents and assists its clients in maintaining their properties. As Vice-President of Properties, COOK was responsible for managing all commercial real estate Properties had under management. As part of those duties, COOK was responsible for hiring subcontractors to complete repair jobs. The management of the commercial properties was subject to a management agreement between Properties and the building owners. In all relevant years, COOK's compensation from Properties consisted of a $60,000.00 annual salary and commission on lease renewals and new tenant leases.

13. Beginning in 2015, or earlier, COOK used his position as Vice-President of Properties to direct repair work to SSI. SSI performed no skilled labor, had no employees, and all

regular laborers were unskilled.  Most of the work SSI performed on behalf of Properties was subcontracted.  COOK was the initial point of contact for many of the subcontractors and directed the subcontractors that all work must be run through SSI.  COOK received bids/proposals from subcontractors or was told about them by STENSTROM.  COOK reviewed and approved all SSI bids/proposals, reviewed and approved all SSI final invoices, and reviewed and approved all Properties' disbursements to SSI.

14.     COOK and STENSTROM used SSI to fraudulently obtain monies from Properties' clients by causing SSI to bill for work that was not performed, overbilling for work, and causing SSI's inflated invoices to be submitted to insurance companies to obtain insurance proceeds to which Properties' clients were not entitled.  COOK directly received a substantial financial benefit from the fraudulently obtained proceeds and concealed this fact from Properties and its clients.  The scheme resulted in a loss of approximately $4,250,000.00, the majority of which directly benefited COOK.

15.     By November 2019, COOK and STENSTROM ceased directly using SSI on Properties' jobs.  COOK and Brian Cook, COOK's brother, then formed a new company named MIDWEST PROPERTY MAINTENANCE SOLUTIONS (MPMS).  MPMS operated in the same manner as SSI but with new ownership.  MPMS had performed no skilled labor and its only employees were COOK, Brian Cook, and a former SSI laborer.  Most of the work MPMS performed on behalf of Properties was subcontracted.  COOK, in his role as Vice-President of Properties, was the initial point of contact for subcontractors, many of which were the same as SSI previously used.  COOK received bids/proposals from subcontractors or was told about them by Brian Cook.  COOK reviewed and approved all MPMS bids/proposals, reviewed and approved all MPMS final invoices, and reviewed

and approved all Properties' disbursements to MPMS.  COOK received substantial financial benefit from the operations of MPMS.  COOK concealed his financial interest in MPMS and STENSTROM's involvement in MPMS from Properties and Properties' clients.

16.     COOK, Brian Cook, and STENSTROM used MPMS to fraudulently obtain monies from Properties' clients by billing for work that had previously been completed by SSI, billing for work that was not performed, billing for warranties it did not provide and were previously paid for by Properties' clients, and overbilling for work that was done.  The continued scheme resulted in a loss of not less than $600,000.00, most of which benefitted COOK and Brian Cook.

17.     In addition to the scheme involving SSI and MPMS, COOK fraudulently obtained monies from Properties' clients by causing Properties' clients to reimburse COOK for personal expenses, causing Properties' clients to pay COOK a fee of approximately $850,000.00 for negotiations with insurance companies, and by requiring subcontractors to pay kickbacks to obtain work from Properties resulting in an additional loss of not less than $1,100,000.00.

18.     In total, the scheme(s) identified above resulted in a loss of not less than $5,950,000.00.  The proceeds from the scheme(s) were deposited into SSI's, MPMS's, and COOK's bank accounts where the fraudulently obtained funds were commingled with legitimate funds.  The funds were then transferred to various bank accounts held in COOK's name, STENSTROM's name, Brian Cook's name, AZ Midwest Properties, LLC, 14334 Industrial Road, LLC and B & B Real Estate, LLC, where they were further commingled with legitimate funds.  The proceeds were then used to acquire residential and

commercial real estate, luxury vehicles, jewelry, watches, credit card purchases, and loan payments. COOK, STENSTROM, and Brian Cook concealed the scheme by laundering the proceeds through various business and personal bank accounts, purchasing and selling the aforementioned assets, and subsequently using those proceeds to acquire additional assets.

### INVOICES WHERE NO WORK WAS PERFORMED

19.   As part of the Scheme, STENSTROM emailed Properties invoices for work that was not performed and/or performed in a different year. With respect to invoiced work that was performed in a different year, SSI subsequently billed for the work when it was done resulting in a double billing. To date, the investigation has identified seventy-five invoices totaling $985,946.00 where no work was performed or was performed in a different year than originally billed. To determine whether work was performed, Agents obtained all the paid SSI invoices from Properties. Bank records were then reviewed to determine what subcontractors worked on which jobs and the subcontractors were interviewed. In each case, payments to subcontractors were tied to specific jobs. Each of the fraudulent invoices were reviewed and approved by COOK.

20.   As part of the scheme, Brian Cook emailed Properties for work that was not performed. To date, the investigation has identified thirty-two invoices totaling $360,395.00 where no work was performed or the work was performed by another company and the same work was subsequently paid for by Properties' clients. To determine whether the work was performed Agents obtained all paid MPMS invoices from Properties, invoices and contracts from subcontractors, interviewed MPMS's sole laborer, and interviewed the contractors that actually performed the work. Each of the fraudulent invoices were

12

reviewed and approved by COOK.

21.     As part of the scheme, Brian Cook emailed a subcontractor a fraudulent invoice seeking payment of $121,468.00 for the installation of a parking lot.  The subcontractor had previously been hired by COOK through Properties on behalf of one of Properties' clients.  The subcontractor had previously received a $121,468.00 material deposit from Properties.  COOK called the subcontractor and instructed him to pay MPMS per the invoice Brian Cook sent.  The subcontractor was interviewed, provided records relevant to the transaction, and confirmed the payment to MPMS was not for the installation of a parking lot.

**INFLATED INVOICES ON INSURANCE JOBS**

22.     As part of the Scheme, STENSTROM emailed Properties invoices for work that was performed but billed an inflated amount.  The investigation has determined that general contractors typically bill cost plus 5% to 20% of the cost for their time and overhead.  This is consistent with what SSI billed clients other than Properties.  With respect to the identified invoices, SSI billed Properties cost plus approximately 55% to 2000% of the cost.  In each instance, COOK was aware of the actual cost of the work and approved the payment despite the inflated amount of the invoices.  The excess billing on the identified invoices totals $1,437,544.70.  The invoices relate to concrete work, asphalt work, landscaping, and roofing.  The invoices that relate to roofing were paid using insurance proceeds.  Those inflated invoices were submitted by COOK to insurance companies.  The submission of the inflated invoices resulted in checks being issued by the insurance companies to cover costs that were not legitimately incurred by the claimants.  The checks from the insurance companies were mailed.

13

23.     As part of the scheme, Brian Cook emailed Properties for work that was performed at inflated amounts. The invoices that have been identified to date as being inflated all relate to snow removal. During the 2021-2022 snow season, MPMS billed eight of Properties' clients $194,000.00 for snow removal when the most it should have billed is approximately $24,000.00. Properties' snow removal contracts typically set snow removal fees based on the amount of snow. The MPMS snow removal contracts set a monthly fee, regardless of work performed. COOK's explanation for using MPMS rather than the prior subcontractor was that the prior subcontractor was too expensive. Agents have obtained MPMS's invoices related to snow removal and interviewed an independent subcontractor that provided snow removal service to Properties' clients during that same season. According to that subcontractor, the most he was able to bill for snow removal for any building for the entire 2021-2022 season was $3,000.00. COOK approved both MPMS's snow removal invoices and the independent subcontractors' invoices.

**KICKBACK SCHEME**

24.     As part of the scheme, COOK required a roofing subcontractor to agree to pay STENSTROM a kickback equal to a percentage of the subcontractor's anticipated net profit on insurance roofing jobs. The total fee paid by the subcontractor to STENSTROM is $1,828,975.40. The subcontractor agreed to pay STENSTROM the $1,828,975.40 if COOK used his company to replace the roofs on approximately seventeen buildings managed by Properties. The $1,828,975.40 was paid from the payments Properties' clients made to the subcontractor. STENSTROM and SSI performed little to no work in relation to the roof replacements. The $1,828,975.40 was transferred from the subcontractor's Bank of America bank account to SSI's UMB bank

14

account in six electronic transfers from February 19, 2020, to February 12, 2021.  Prior to receiving the payments, the subcontractor required STENSTROM to email him invoices.  The invoices from STENSTROM describe the purpose for the payment as "consulting" and "construction services."  STENSTROM provided no such services.

25.    With respect to the same roofing jobs discussed in paragraph 24 above, COOK required Properties' clients to pay him a fee of approximately $850,000.00 for negotiating the insurance claim.  The insurance claim process was largely managed and negotiated by and between Properties' lawyers and the insurance company and the roofing subcontractor.  Agents interviewed the owners of Properties who confirmed the fee was not appropriate under the management agreement between Properties and its clients.

26.    In addition to the kickbacks from the roofing subcontractor, COOK required another subcontractor to pay kickbacks.  From 2015 to 2021, COOK received $252,000.00 from a landscaper as a "kickback" to obtain work at Properties.  COOK told the landscaper that the owner of Properties determined that the landscaper must now pay COOK personally for the work he obtained through Properties.  The kickbacks were deposited in COOK's personal account at UMB bank.

27.    SSI received funds from Properties' clients in a number of ways, including by checks and through wire transfers.  Checks from Properties' clients were typically drawn on their bank account at Pinnacle Bank located in Omaha, Nebraska and deposited into SSI's bank account at UMB bank, headquartered in Kansas City, Missouri.  Once deposited in SSI's UMB bank account, funds were comingled with legitimate funds and transferred to STENSTROM's personal account also held at UMB bank.  Funds deposited into STENSTROM's personal account were further comingled with legitimate funds and used

to pay personal expenses, COOK's credit card purchases, transferred by check to COOK, or used to invest in real estate located in Nebraska and Arizona.

28.    MPMS received funds from Properties' clients primarily via check.  Checks from Properties' clients were typically drawn on their bank account at Pinnacle Bank located in Omaha, Nebraska and deposited into MPMS's account also held at Pinnacle Bank.  Once deposited, the funds were used to purchase various vehicles titled in MPMS's name, transferred to COOK via check, transferred to Brian Cook via check, and transferred to 149334 Industrial Road, LLC via check where the proceeds were further commingled with legitimate funds.  Funds deposited into the personal accounts were used to for pay personal expenses, credit card purchases, vehicles, and real estate.  Funds deposited into the 149334 Industrial Road, LLC account were used to pay a commercial loan, transferred to Brett Cook via check, and pay other expenses related to the business.

29.    COOK received funds from Properties via ACH payroll deposits via check and the kickbacks from subcontractors via check.  The ACH payroll deposits and checks were deposited in COOK's personal bank account held at UMB bank.  The deposited funds were then commingled with legitimate funds and used to pay personal expenses, pay personal loans and mortgages, life insurance premiums, and purchase real estate, vehicles, jewelry, watches, and other luxury items.

30.    Throughout the scheme, COOK, STENSTROM, and Brian Cook concealed COOK's involvement in the scheme by running the misappropriated funds through SSI's, MPMS's and STENSTROM's accounts, representing to others that SSI and the income it earned was controlled solely by STENSTROM, that the funds deposited in MPMS's and SSI's bank accounts were legitimate service-related income, commingling the misappropriated

funds with legitimate funds, using the misappropriated funds to purchase assets, and subsequently converting such assets into currency for the purchase of additional assets.

## EVENTS DURING THE INVESTIGATION

31.     On March 14, 2022, STENSTROM pled guilty to evading income tax of $1,954,505.10 in the United States District Court for the District of Nebraska case number: 8:22CR55. The offense conduct relates to tax years 2012 to 2016.  The plea agreement states that STENSTROM used the funds of SSI to acquire assets then held in the name of a third party including a home in Queen Creek, Arizona valued at approximately $1,000,000.00, a Ferrari 488 Coupe valued at $200,000.00 to $300,000.00, a boat, an ATV, a Jeep, and a home located in Fremont, Nebraska valued at approximately $450,000.00.

32.     On May 3, 2022, Agents executed a search warrant at COOK's home located at 980 County Road W, Space 1146, Fremont, Nebraska.  During the search, Agents seized cash, jewelry, watches, and other luxury items.  The cash seized during the execution of the search warrant totaled $74,743.00.  Most of the cash seized was $100.00 bills and located with envelopes and/or deposit slips from accounts held at UMB bank by COOK or STENSTROM.

33.     On May 4, 2022, Saunders County Sheriff's Department (SCSD) contacted Agents regarding the apparent suicide of COOK.  Upon arrival SCSD found COOK deceased. COOK had been shot once in the torso and once in the head.  COOK's death was ruled a suicide.

## USE OF FUNDS

34.     Financial records indicate COOK/STENSTROM expended approximately $4,399,198.00 of Properties' clients' funds in the following ways:

a.      Approximately $991,829.00 was paid to Toll Brothers Arizona to pay for the construction of COOK's personal home located at 17756 East Colt Drive, Queen Creek, Arizona;

b.      Approximately $345,424.00 was paid to McLaren of Scottsdale for the purchase of a 2020 McLaren 600LT Spider;

c.      Approximately $306,615.00 was paid to Scottsdale Ferrari-Maserati for the purchase of a 2017 Ferrari 488 GTB;

d.      Approximately $998,434.00 was paid to credit card company JP Morgan Chase;

e.      At least $313,000.00 was paid on personal lines of credit held at UMB bank;

f.      Premiums on Farmers NW Life Insurance policy 009138164 in the amount of $4,826.60;

g.      Premiums on Farmers NW Life Insurance policy 009165409 in the amount of $4,826.60;

h.      Premiums on Farmers NW Life Insurance policy 009165409 in the amount of $6,600.00;

i.      Permanent improvements made to the property located at 980 County Road W, Space 1146, Fremont, Nebraska in the amount of $150,000.00;

j.      Approximately $100,000.00 was paid for the purchase of a 50% interest in the commercial real estate located at 2203 23rd Street, Columbus, Nebraska;

k.      $75,000.00 currently held in the B & B Real Estate, LLC's First Westroads Bank account;

l.      Approximately $470,000.00 was paid for the purchase of 4859 South 136 Street, Omaha, Nebraska;

m.      Approximately $80,000.00 was paid for the purchase of a 2022 GMC Sierra-K2600 AT4 4x4 Red VIN#1GT49PEYXNF163905;

n.      Approximately $80,000.00 for the purchase of 2022 GMC Sierra-K2500 AT4 CC 4x4 Red VIN#1GT49PEY5NF145456;

o.      No less than $103,000.00 was paid to Wells Fargo Home Mortgage related to the purchase of the property located at 19607 Mayberry Street, Omaha, Nebraska;

p.    Approximately $364,807.00 was paid for the purchase of the property located at 20505 York Street, Elkhorn, Nebraska;

q.    Approximately $4,836.00 was paid for the purchase of a Breitling Aviator 8 Curtis Warhawk watch with green dial, green military band Model# A133161AL1X1, Serial# 2989028.

**17756 East Colt Drive, Queen Creek, Arizona**

35.    From January 2015 to February 2021 SSI received approximately $4,250,000.00 of misappropriated funds from various Properties' clients via wire and check.  Those funds were deposited into SSI's UMB bank account and commingled with legitimate proceeds.  The funds were then used to pay personal expenses and transferred to STENSTROM's personal account at UMB bank where the funds were further commingled with other legitimate proceeds.  Once transferred to STENSTROM's personal account the funds were used to pay the personal expenses of COOK and STENSTROM and transferred to COOK via check.  Funds paid to COOK via check were deposited into COOK's personal account at UMB bank and used to pay personal expenses.  Below are some examples of how the funds were used.

36.    Beginning in September 2016, STENSTROM used the misappropriated funds to begin construction on his and COOK's second home in Arizona located at 17756 East Colt Drive, Queen Creek, Arizona.  Between June 20, 2016, and September 6, 2016, STENSTROM deposited approximately $120,000.00 from various Properties' clients paid on invoices for which SSI did not perform work.  On September 6, 2016, STENSTROM wrote check 6437 in the amount of $21,600.00 to Toll Brothers Arizona.  On October 5, 2016, STENSTROM wrote check 6462 in the amount of $24,664.00 to Toll Brothers Arizona.  On November 6, 2016, STENSTROM wrote check 6471 in the amount of $10,030.00 to Toll Brothers Arizona.  According to STENSTROM and real

19

estate records, Toll Brothers Arizona is the company that constructed the home located at 17756 East Colt Drive, Queen Creek, Arizona. The three checks from SSI to Toll Brothers were made with funds "involved in" a money laundering transaction.

37.     Between January 1, 2015, and May 11, 2017, STENSTROM wrote checks to COOK totaling approximately $230,000.00 ($570,000.00 through July 2020) from STENSTROM's personal account at UMB bank funded by SSI deposits. The checks were deposited into COOK's personal account at UMB bank. On March 3, 2017, STENSTROM deposited a $45,000.00 check from SSI's UMB bank account into his personal account. That same day, STENSTROM wrote check number 4385 in the amount of $35,000.00 to COOK. On April 24, 2017, STENSTROM deposited a $14,500.00 check from SSI's UMB bank account into his personal account. That same day, STENSTROM wrote check number 5388 in the amount of $10,000.00 to COOK. On May 11, 2017, COOK wired $400,000.00 from his personal UMB bank account to Fidelity National Title as closing funds for the purchase on the East Colt home. The checks from STENSTROM to COOK and the wire from COOK to Fidelity Nation Title were made with funds "involved in" a money laundering transaction.

38.     On July 7, 2017, STENSTROM deposited a $20,000.00 check from SSI drawn on SSI's UMB bank account into his personal account. On July 14, 2017, STENSTROM wrote check number 5389 in the amount of $5,000.00 to COOK. On August 7, 2017, COOK wired $66,798.46 from his personal account at UMB bank to Fidelity National Title as closing funds for the purchase of the East Colt home. The remaining purchase price was paid from the sale proceeds of the home located at 3053 East Vermont Drive, Gilbert, Arizona. The checks from STENSTROM to COOK and the wire from COOK to Fidelity

Nation Title were made with funds "involved in" a money laundering transaction.

39.     On or around January 24, 2012, COOK and STENSTROM purchased the property

located at 3053 East Vermont, Gilbert, Arizona for approximately $293,000.00.  The

purchase was funded by a line of credit at UMB bank.  From January 2015 to March

2017 (sale date), STENSTROM paid $230,000.00 on that line of credit.  Payments were

made via electronic bank transfer from STENSTROM's individual UMB bank account

on the following dates and in the following amounts:  June 27, 2016, $30,000.00; August

4, 2016, $50,000.00; September 23, 2016, $40,000.00; November 16, 2016, $10,000.00;

January 5, 2017, $50,000.00; February 16, 2017, $50,000.00.  The payments from

STENSTROM on the line of credit were made with funds "involved in" a money

laundering transaction.

40.     In March 2017, STENSTROM purchased the property located at 4523 East Melrose

Street, Gilbert, Arizona for approximately $265,000.00.  On March 15, 2017,

STENSTROM deposited a check drawn on SSI's UMB bank account in the amount of

$260,000.00 into his personal account at UMB bank.  The SSI check was funded by a

$500,000.00 deposit consisting of misappropriated funds from one of Properties' clients.

That same day, STENSTROM wired $256,360.21 from his personal account to Security

Title Agency for the purchase of the East Melrose Street home.  The remaining purchase

price was paid from COOK's personal account at UMB bank in February 2017 via check

number 3278 in the amount of $2,600.00 and check number 3279 in the amount of

$7,400.00.  The funds used to purchase the home were "involved in" a money laundering

transaction.

**Ferrari 488 Coupe**

41.  In August 2018, STENSTROM transferred his interest in the property located at 4523 East Melrose Street, Gilbert, Arizona to Michael Cook, COOK's father.  The transfer was recorded as exempt from transfer tax as a transfer for nominal consideration between family members.  The property was sold by COOK and Michael Cook on October 2, 2018.  The sale generated net proceeds of $286,896.83.  The net proceeds were paid to COOK via wire from Security Title Agency and deposited into COOK's personal account at UMB bank.  The proceeds from the sale of the East Melrose Street home are funds "involved in" a money laundering transaction.

42.  On August 8, 2018, COOK received a $300,000.00 deposit from his personal line of credit into his personal bank account at UMB bank.  On August 9, 2018, COOK sent a wire from his personal bank account to First American Title Company in the amount of $419,196.33 for the purchase of the property located at 20094 East Quintero, Queen Creek, Arizona.  The property was titled in the name of the Michael and Barbara Cook Revocable Trust and the Brett Cook Revocable Trust.  On October 2, 2018, COOK received a wire of $286,896.83 from Security Title Agency related to the sale of the home located at 4523 East Melrose Street, Gilbert, Arizona.  On October 3, 2018, COOK transferred $275,000.00 from his personal account to UMB bank as payment on his personal line of credit.  The property was sold on April 7, 2020, for approximately $459,000.00.  The sales proceeds were deposited in COOK's personal account at UMB Bank ending in 4805.

43.  On October 5, 2018, COOK received a $300,000.00 deposit from his personal line of credit into his personal bank account at UMB bank.  On October 5, 2018, COOK

purchased a cashier's check payable to Scottsdale Ferrari-Maserati in the amount of $306,615.82. The payment was for the purchase of a 2017 Ferrari 488 GTB. On October 22, 2018, STENSTROM wrote check number 5422 to COOK in the amount of $41,000.00. The check was deposited into COOK's personal account at UMB bank. On November 6, 2018, STENSTROM wrote check number 5423 in the amount of $26,400.00 to COOK. The check was deposited into COOK's personal account at UMB bank. On November 7, 2018, COOK transferred $15,000.00 to pay down his personal line of credit at UMB bank. On November 14, 2018, COOK transferred $25,000.00 to pay down his personal line of credit at UMB bank. COOK sold the Ferrari on February 11, 2020, and received a $205,000.00 wire from The Synergy Group, Inc. deposited into his personal bank account at UMB bank. The funds used to pay down the line of credit used to purchase the Ferrari were "involved in" a money laundering transaction.

**McLaren 600LT Spider**

44. On October 23, 2019, COOK ordered a $345,424.00 2020 McLaren 600LT Spider from McLaren of Scottsdale. In connection with the purchase, COOK was required to make a deposit of $24,290.00. The $24,290.00 was charged to COOK's JP Morgan Chase credit card. On October 23, 2019, COOK made a $25,000.00 payment on his JP Morgan Chase credit card from his personal UMB bank account. The $25,000.00 payment was made with funds "involved in" a money laundering transaction. The remaining balance was paid from loan proceeds of Pinnacle Bank Loan Number 6518180068. The stated purpose of the loan is real estate investment. The loan was taken out on June 3, 2019, in the amount of $376,000.00 and funded a $321,134.53 wire to MWAZ, LLC DBA McLaren Scottsdale sent on October 23, 2019. The collateral on the loan is the property

located at 980 County Road W, Space 1146, Fremont, Nebraska.

**980 County Road W, Space 1146, Fremont, Nebraska**

45.     On October 5, 2020, COOK paid PDI Construction $150,000.00 via check number 3494 drawn on his UMB bank account.  The payment was for permanent improvements made to COOK's personal home located at 980 County Road W, S-1146, Fremont, Nebraska.

**B & B Real Estate, LLC**

46.     On or around December 2021, COOK and Brad Morehouse purchased the property located at 2203 23rd Street, Columbus, Nebraska through B & B Real Estate, LLC. COOK owned fifty percent of B & B Real Estate, LLC while Brad Morehouse owned the remaining fifty percent.  COOK wired $90,000.00 from his personal account located at Pinnacle Bank to B & B Real Estate, LLC's account at First West Roads Bank on December 14, 2021.  The wire was funded, in part, by the following deposits:

a.      MPMS check number 1212 in the amount of $4,200.00 dated February 18, 2021;

b.      MPMS check number 1214 in the amount of $10,000.00 dated March 1, 2021;

c.      MPMS check number 1224 in the amount of $4,200.00 dated March 25, 2021;

d.      MPMS check number 1262 in the amount of $4,200.00 dated June 17, 2021;

e.      MPMS check number 1284 in the amount of $4,200.00 dated July 21, 2021;

f.      MPMS check number 1302 in the amount of $4,200.00 dated September 16, 2021;

g.      MPMS check number 1303 in the amount of $10,000.00 dated September 16, 2021;

h.      MPMS check number 1320 in the amount of $6,200.00 dated October 27, 2021;

    i.      COOK check number 3582 from his personal UMB bank account in the amount of $10,000.00 dated November 30, 2021.

On December 3, 2021, COOK deposited a kickback payment dated November 28, 2021, from a landscaper in the amount of $7,500.00.   According to Morehouse, the property was purchased for approximately $350,000.00.  Morehouse contributed $100,000.00 and COOK contributed $100,000.00. The remaining $150,000.00 was financed with a loan through First Westroads Bank.

47.    In April 2022, COOK wrote a check in the amount of $75,000.00 to B & B Real Estate drawn on his personal account at UMB bank.  The check was deposited into B & B Real Estate, LLC's account at First Westroads Bank.  Brad Morehouse was interviewed. According to Morehouse, the $75,000.00 deposit from COOK was intended to be used to purchase the property located at 10935 Emmet, Elkhorn, Nebraska.  COOK died prior to the closing of the property.  Morehouse elected to purchase the property with another independent individual and left the $75,000.00 in B & B Real Estate's account.  As of June 25, 2022, the $75,000.00 remains on deposit.

**4859 South 136th Street and 14334 Industrial Road, LLC**

48.    On or around December 16, 2021, COOK purchased the property located at 14334 Industrial Road, Omaha, Nebraska through 14334 Industrial Road, LLC.  14334 Industrial Road, LLC is owned 100% by COOK.  On December 16, 2020, COOK wired $850,000.00 from his personal account at UMB Bank to 14334 Industrial Road, LLC's account at Pinnacle Bank.  The wire was funded by the following deposits in COOK's personal account at UMB bank:

    a.      March 11, 2020, $50,000.00 from H&H Automotive related to the sale of a Mercedes G63 AMG VIN#WDCYC7HJ2KX310820 purchased by COOK;

b.  March 20, 2020, $50,000.00 H&H Automotive related to the sale of 2019 Mercedes AMG G63 VIN#WDCYC7HJ2KX326466 purchased by STENSTROM, $137,393.00 from Properties (includes roof fee);

c.  April 1, 2020, $23,000.00 from MPMS;

d.  April 15, 2020, $155,466.88 from Properties (includes roof fee);

e.  April 27, 2020, $77,000.00 from MPMS;

f.  June 1, 2020, $16,000.00 from MPMS;

g.  June 18, 2020, $20,000.00 from MPMS;

h.  July 20, 2020, $26,051.00 from MPMS;

i.  September 30, 2020, $68,903.35 from Properties (includes roof fee);

j.  October 15, 2020, $68,903.36 from Properties (includes roof fee);

k.  November 13, 2020, from Properties (includes roof fee);

l.  November 19, 2020, $25,000.00 from MPMS; and

m.  November 30, 2020, from $102,728.36 Properties (includes roof fee).

On December 18, 2020, COOK wired $762,228.75 from 14334 Industrial Road, LLC's Pinnacle Bank account to Missouri River Title and Escrow for the purchase of the property located at 14334 Industrial Road, Omaha, Nebraska.

49.  On September 30, 2021, 14334 Industrial Road, LLC sold the real property located at 14334 Industrial Road, Omaha, Nebraska to Spookboo Properties, LLC for approximately $923,000.00.  $458,691.78 of the sales proceeds were paid to Pinnacle Bank in satisfaction of the existing mortgage on the property.  The remainder was transferred to Ambassador Title Services and used to acquire the property located at 4859 South 136 Street, Omaha, Nebraska as part of a like-kind exchange between 14334 Industrial Road, LLC and Jeffery Heng.  The purchase price of 4859 South 136th Street, Omaha, Nebraska was $950,000.

## AZ MIDWEST

50.    On October 10, 2017, COOK received a $95,000.00 deposit from his personal line of
       credit, on October 11, 2017, COOK received a $95,000.00 deposit from his personal line
       of credit, and on October 12, 2017, COOK received a $60,000.00 deposit from his
       personal line of credit.  On October 11, 2017, COOK wrote STENSTROM check number
       3338 in the amount of $125,000.00.  On October 12, 2017, STENSTROM wrote check
       number 5395 payable to AZ Midwest.  On October 12, 2017, COOK wrote check number
       3339 in the amount of $125,000.00 to AZ Midwest.  The funds were deposited in AZ
       Midwest Properties bank account, which was opened by COOK on October 11, 2017.
       The $250,000.00 from COOK and STENSTROM was comingled with $250,000.00 from
       independent investors and were part of an initial deposit totaling $500,000.00. The initial
       deposit was used to fund a $426,748.00 wire to Security Title Agency for the purchase of
       real estate located at 4006 East Emilta Avenue, Mesa, Arizona.  That property was
       subsequently sold for $536,511.11 on April 20, 2018, and the funds were wired from
       Security Title Agency to AZ Midwest Properties bank at UMB bank.  The proceeds were
       used to fund check 2013 in the amount of $125,000.00 payable to COOK and check 2012
       in the amount of $125,000.00 payable to STENSTROM.  Both checks were applied to
       COOK's personal line of credit at UMB bank and were funds "involved in" a money
       laundering transaction.

51.    On July 30, 2018, STENSTROM wrote check number 5414 in the amount of
       $100,000.00 to AZ Midwest and COOK wrote check number 3383 in the amount of
       $100,000.00 to AZ Midwest.  On September 4, 2018, COOK transferred $100,000.00
       from his personal line of credit and $100,000.00 from his personal bank account at UMB

bank to AZ Midwest.  The funds were comingled with funds from an unrelated partner in AZ Midwest.  On September 4, 2018, AZ Midwest sent a wire of $130,687.60 to Security Title Agency for the purchase of the property located at 408 East Ocotillo Street, Casa Grande, Arizona.  On September 5, 2018, AZ Midwest sent a wire of $191,157.39 to Title Alliance Agency of Phoenix for the purchase of the property located at 6742 East Ensenada Street, Mesa, Arizona.  On September 27, 2018, AZ Midwest sent a wire of $243,159.47 to Security Title Agency for the purchase of the property located at 2212 West Del Campo Circle, Mesa, Arizona.

52.     On October 2, 2018, AZ Midwest received a wire of $208,381.67 from Security Title Agency for the sale of the property located at 6742 East Ensenada Street, Mesa, Arizona. The deposit funded check number 2019 in the amount of $100,000.00 payable to UMB bank.  The payment was applied to COOK's personal line of credit.  The funds used to pay down the line of credit are funds "involved in" a money laundering transaction.

53.     On November 29, 2018, AZ Midwest received a wire of $244,180.57 from Security Title Agency for the sale of the property located at 2212 West Del Campo Circle, Mesa, Arizona.  The deposit funded check number 1110 in the amount of $50,000.00 payable to STENSTROM, check number 2022 in the amount of $50,000.00 payable to UMB bank and applied to COOK's personal line of credit, and check number 2023 in the amount of $50,000.00 payable to STENSTROM.  The checks to STENSTROM funded the payment of personal expenses including the payment of his mortgage and a cashier's check payable to the United State Treasury.  The funds received from AZ Midwest were funds "involved in" a money laundering transaction.

54.     On December 12, 2018, AZ Midwest received a wire of $138,804.62 from Security Title

Agency for the sale of the property located at 408 East Ocotillo Street, Casa Grande, Arizona.  The deposit funded check number 1108 in the amount of $75,000.00 payable to COOK and check number 2025 in the amount of $75,000.00 payable to COOK.  Check 2025 was deposited by COOK in his personal account at UMB bank on December 13, 2018.  Check 1108 was applied towards COOK's personal line of credit at UMB bank. On December 24, 2018, COOK wrote check number 3401 in the amount of $80,000.00 payable to Merrill Lynch.  The funds received from AZ Midwest were funds "involved in" a money laundering transaction.

55.   On April 4, 2019, AZ Midwest wrote check number 2029 in the amount of $7,500.00 payable to COOK and check number 2030 in the amount of $7,500.00 to STENSTROM. The check payable to STENSTROM appears to have been cashed.  The check to COOK was deposited into his personal account at UMB bank on April 4, 2019, and used to pay COOK's personal expenses.

56.   On November 11, 2018, COOK purchased the home located at 19607 Mayberry Street, Omaha, Nebraska.  The purchase of the home was funded, in part, by a mortgage held at Wells Fargo Home Mortgage.  The mortgage was paid from COOK's personal bank account at UMB bank, approximately $103,000.00 from 2017 - 2019.  On July 3, 2019, COOK received a $307,047.91 wire from Ambassador Title Service related to the sale of the home.  The deposit was used to pay personal expenses including Farmers Northwest Life Insurance Policy number 009138164, credit card payment to JP Morgan Chase, check number 3435 in the amount of $143,625.76 payable to STENSTROM, and check number 3432 payable to JF Carter in the amount of $65,000.00.  The $65,000.00 check is for the purchase of an interest in Carefree Hospitality, a partnership operating a hotel in

Carefree, Arizona.  The proceeds from the sale of the Mayberry house are funds "involved in" a money laundering transaction.

**CASH**

57.     Between 2015 and January 2022, STENSTROM and COOK received cash back (or cashed checks) on deposits totaling at least $118,000.00.  With respect to COOK, most of the cash back on deposits relate to "kickbacks" COOK received from a subcontractor for work the subcontractor was awarded at Properties and checks from MPMS.  For example, on November 11, 2019, COOK received a $8,000.00 "kickback" from the subcontractor and took cash back of $3,000.00.  The only other relevant cash back transaction with respect to COOK involves cash back received for the use of a box suite at the University of Nebraska and the sale of gift cards.  The box suite was paid for by SSI check number 6571 with misappropriated Properties' client funds.  The gift card purchase was paid for by COOK and charged to his credit card.  In December 2020, COOK was reimbursed for the gift cards by Properties.  STENSTROM received $69,300.00 in cash back on deposits of SSI checks and cashed a check from AZ Midwest in the amount of $7,500.00.  Approximately $75,000.00 of the $118,000.00 in cash back transactions STENSTROM and COOK are known to have conducted occurred in 2020 or later.  The cash back and cashed check transactions of COOK and STENSTROM relate to funds "involved in" a money laundering transaction.

## COOK'S CREDIT CARD

58.     From December 2016 through March 2022, COOK purchased approximately
$293,000.00 in watches and jewelry from various jewelers including: Hyde Park,
Borsheims, Gundersons, Mark Edwards, Stein Diamonds, Omega watches, Rocks The
Jewelers, and L'Amor Jewelers.  Many of the specific watches and jewelry are listed
above.  (See ¶ 6).  Examples of COOK's use of misappropriated funds to acquire the
watches and jewelry are provided below:

a.      On or around December 15, 2016, COOK ordered watches from Omega.
COOK charged his JP Morgan Chase credit card $28,877.00 to purchase
the watches.  On December 24, 2016, COOK paid $6,043.69 from his
personal account at UMB bank.  On December 30, 2016, STENSTROM
paid $19,000.00 from his personal account at UMB bank.  On January 3,
2017, STENSTROM paid $5,530.36 from his personal account at UMB
bank.  The funds used to pay down COOK's credit card were "involved
in" a money laundering transaction.

b.      On or around June 5, 2017, COOK purchased a Zenith EL Primero watch
Item Number 1ZNTH0007 from Borsheims.  COOK charged his JP
Morgan Chase credit card $8,318.18 for the purchase.  On June 6, 2017,
STENSTROM paid $8,500.00 from his personal account at UMB bank.
On June 12, 2017, STENSTROM paid $1,145.87 from his personal
account at UMB bank.  The funds used to pay down COOK's credit card
were "involved in" a money laundering transaction.

c.      On October 19, 2019, COOK purchased a Hublot Bing Bang watch Item
Number WHBG0129 from Hyde Park Jewelers of Scottsdale.  Cook
charged his JP Morgan Chase credit card $28,309.10 to purchase the
watch.  On October 21, 2019, COOK paid $29,000.00 from his personal
account at UMB bank.  The funds used to pay down COOK's credit card
were "involved in" a money laundering transaction.

d.      On December 7, 2020, COOK purchased a Breitling Navitimer 43mm
watch Item Number WBTG1778 from Hyde Park Jeweler in Scottdale,
Arizona for $8,685.00 and purchased an extended warranty plan for
$599.99.  COOK paid for the purchase using his JP Morgan Chase Visa
ending in 8795.  On December 31, 2020, COOK made a payment on the
credit card in the amount of $17,500.00 from his UMB bank account
ending in 4805.  The funds used to pay down COOK's credit card were
"involved in" a money laundering transaction.

e.      On August 25, 2021, COOK purchased a Rolex Daytona watch 116509 Serial Number 65S626F8 21749 for $54,000.00, a Rolex Oyster Perpetual 124300 Serial Number X64G6926 AF124300X6 for $13,500.00, and a Rolex Oyster Perpetual 124300 Serial Number 259G7053 2831-7351-4857 for $17,500.00 from Stein Diamonds.  The purchase was paid for with an $85,000.00 wire from COOK's personal Pinnacle Bank checking account ending in 6517.  The funds used to pay down COOK's credit card were "involved in" a money laundering transaction.

f.      On November 4, 2021, COOK purchased a custom 18K Yellow Gold Hockey Goalie pendant with diamonds .54 cttw and 20" yellow gold Franco 5mm chain from L'Amor Jewelers for $10,000.00.  COOK paid for the pendant with check number 3576 in the amount of $10,000.00 drawn on his personal UMB bank account ending in 4805.  The funds used to pay down COOK's credit card were "involved in" a money laundering transaction.

g.      On November 23, 2021, COOK purchased a custom 18K white gold adjustable chain and four hearts solitaire pendants 1.03 ct HS F/VS1 GIA 14465889, 1.01 ct HS F/VS2 GIA 14913989, 1.50 ct HS D/VS1 GAI 15181577, 1.51 ct HS D/VS1 GIA 15022459 for $52,000.00 and a Rolex Oyster Perpetual 124300 Serial Number X5965319 22244 for $10,000.00 from L'Amor Jewelers.  Cook paid for the purchase with check number 3581 in the amount of $62,000.00 drawn on his UMB bank account ending in 4805.  The funds used to pay down COOK's credit card were "involved in" a money laundering transaction.

h.      On January 24, 2022, COOK purchased an 18K yellow gold hockey player pendant with .15 cttw diamonds 20" 5MM Franco Chain for $13,800.00 and an 18K white gold bull rider pendant w/ .06 cttw diamonds 20" 5mm Franco Chain for $13,800.00 from L'Amor Jewelers.  COOK paid for the purchase with check number 3591 in the amount of $27,600.00 drawn on his personal UMB bank account ending in 4805.  The funds used to pay down COOK's credit card were "involved in" a money laundering transaction.

i.      On June 18, 2020, COOK purchased an 18kt white gold wide diamond ring sq cut diamonds 5.33 emerald cut sapphires 5.74 #13604 for $14,500.00 and an 18kt white gold ladys ring 5 oval saph 3.00 cts micro diamonds .60 for $3,449.53 from Mark Edward Jewelers.  The purchase was paid for with COOK's JP Morgan Chase credit card.  On June 18, 2020, COOK paid $20,000.00 via ACH payment on his JP Morgan Chase credit card from his personal account at UMB bank.  The funds used to pay down COOK's credit card were "involved in" a money laundering transaction.

j.      On November 16, 2020, COOK purchased a Rolex 40MM Oyster

Perpetual Daytona White Mop8 Item Number GAAZ003732, Serial Number C3J48934 for $34,400.00, an Astron SS CSHN Brace Watch Item Number GEAZ002261 for $2,000.00, a ¼ ctw DIA 14KW 18" station necklace Item Number CGAZ002336 for $975.00, and a 8.30 ctw DIA 18KW necklace Item Number 510Z007405 for $19,000.00 from Gunderson's Jewelers. The purchase was charged to COOK's JP Morgan Chase credit card. On November 16, 2020, COOK paid $55,600.00 via ACH transfer on his JP Morgan Chase credit card from his personal account at UMB bank. On November 16, 2020, COOK also wrote check number 3965 in the amount of $5,321.25 to Gunderson's Jewelers drawn on his personal account to pay the remaining balance. The funds used to pay down COOK's credit card were "involved in" a money laundering transaction.

k.    On January 14, 2021, COOK purchased a Rolex 41MM 904L Oystersteel Swiss-made Rolex Oyster Perpetual style number GAAZ003817, Serial Number 179E626 from Gunderson's Jewelers for $5,900.00. The payment was charged on COOK's JP Morgan Chase credit card. On January 15, 2021, COOK paid $7,500.00 via ACH transfer on his JP Morgan Chase credit card from his personal account at UMB bank. The funds used to pay down COOK's credit card were "involved in" a money laundering transaction.

l.    On September 27, 2019, COOK purchased a Breitling Aviator 8 Curtis Warhawk watch with green dial, green military band Model# A133161AL1X1, Serial# 2989028 from Rock the Jewelers for approximately $4,836.00. The purchase was charged to COOK's JP Morgan Chase credit card. On September 29, 2019, COOK paid $11,708.86 on his JP Morgan Chase credit card via ACH transfer from his personal account at UMB bank. On October 2, 2019, COOK paid $25,000.00 on his JP Morgan Chase credit card via ACH transfer from his personal account at UMB bank. The funds used to pay down COOK's credit card were "involved in" a money laundering transaction

**Midwest Property Maintenance Solutions**

59.    On October 29, 2020, MPMS purchased a 2020 GMC Sierra-K1500 Denali CC 4x4 VIN#1GTU9FEL0LZ371611 for approximately $80,000.00 with accessories. As a part of the purchase, BRIAN COOK traded in a 2020 BMW X5-M Competition VIN#5YMJU0C03L9C86120 funded by BMW Financial Services. The BMW was given a trade-in allowance of $91,083.44 with a balance due to BMW financial services of $116,639.44. On October 31, 2020, Check Number 1171 in amount of $98,500.00 was

paid from MPMS's Pinnacle Bank account to Woodhouse Auto as payment for the vehicle.  The funds used to purchase the vehicle were "involved in" a money laundering transaction.

60.　　On January 7, 2022, MPMS purchased a 2022 GMC Sierra-K2600 AT4 4x4 Red VIN#1GT49PEYXNF163905 for a cash price of approximately $83,000.00 with accessories.  As part of the purchase, MPMS traded-in a 2020 GMC Sierra-K1500 Denali White VIN#1GTU9FEL0LZ371611 with a trade-in allowance of $62,000.00 and a $1,000.00 rebate.  The net cash due on the purchase was $20,548.00.  The individual making the purchase was COOK.  On January 21, 2022, MPMS wrote check 1355 in the amount of $20,548.00 to Woodhouse GMC as full payment on the purchase.  The check was paid from MPMS's account at Pinnacle Bank.  The funds used to purchase the vehicle were "involved in" a money laundering transaction.

61.　　On May 24, 2021, MPMS purchased a 2021 GMC Sierra-K2500 AT4 CC 4x4 Red VIN#1GT19PEY8MF266662 with a cash price of approximately $80,000.00.  As part of the purchase, MPMS traded in a 2020 GMC Sierra K1500 Denali CC 4x4 Blue VIN#3GTU9FEL6LG346096 receiving a trade-in allowance of $59,249.00 and a rebate of $750.00.  The net cash due on the purchase was $20,000.00.  On June 4, 2021, MPMS wrote check number 1252 in the amount of $20,000.00 to Woodhouse GMC as full payment for the purchase.  The check was paid from MPMS's account at Pinnacle Bank. The funds used to purchase the vehicle were "involved in" a money laundering transaction.

62.　　On November 2, 2021, MPMS purchased a 2022 GMC Sierra-K2500 AT4 CC 4x4 Red VIN#1GT49PEY5NF145456 for a cash price of approximately $82,000.00.  Brian Cook

was present to make the purchase.  On November 5, 2021, MPMS wired Woodhouse

Buick, GMC $81,749.00 as full payment for the vehicle.  The wire was sent from

MPMS' Pinnacle Bank account.  The funds used to purchase the vehicle were "involved

in" a money laundering transaction.

63.    On July 14, 2020, MPMS purchased a 2020 GMC Sierra K1500 Denali CC 4x4 Blue

VIN#3GTU9FEL6LG346096 for a cash price of approximately $71,000.00.  There was

no trade-in on the deal, however, MPMS received a $6,400.00 rebate.  The net cash due

was $64,647.00.  On July 16, 2020, MPMS paid $64,647.00 via check number 1126

drawn on MPMS's Pinnacle Bank account.  The funds used to purchase the vehicle were

"involved" in" a money laundering transaction.

64.    On February 23, 2022, COOK purchased a 2021 Chevrolet Silverado VIN#

1GC4YVEY6MF185048 4WD Crew from Scottsdale Ferrari for $86,661.03.  The

purchase was funded with a wire from COOK's personal account at Pinnacle Bank on

February 23, 2022, in the amount of $86,661.03.  Between February 19, 2021, and

January 31, 2022, COOK's personal account at Pinnacle Bank received approximately

$66,000.00 in deposits from MPMS, $12,000.00 in deposits related to the sale of

University of Nebraska hockey tickets that were previously reimbursed by Properties, and

$260,000.00 in deposits from 14334 Industrial Road, LLC.

**FARMERS NW LIFE INSURANCE POLICY**

65.    Farmers NW Life Insurance police number 009138164 was taken out in January 2010 by

COOK and STENSTROM.  The life insurance policy application lists COOK as the

primary insured and the policy owner as STENSTROM.  In box B. Proposed Policy

Owner, STENSTROM is listed as the owner and his relationship to COOK is listed as

35

Business Associate.  The policy includes a financial questionnaire.  The questionnaire explains the purpose of the insurance is the business continuation of SSI.  The questionnaire is signed by COOK and STENSTROM and dated January 18, 2012.  As of COOK's death on May 4, 2022, the policy had a face value of $1,000,000.00.  The policy has a suicide clause that would limit the benefit to the premiums if death occurred by suicide within two years.  The premium on the policy was paid by electronic fund withdrawal from STENSTROM's personal UMB bank account except for one premium payment occurring on March 29, 2021.  As of June 17, 2022, Farmers NW Life had not paid out on the policy as STENSTROM had not completed and provided the required documents.

66.   Farmers NW Life insurance policy 009165409 was taken out on March 19, 2010, and the beneficiary is the Brett Cook Irrevocable Trust.  The face value of the life insurance policy is $1,000,000.00.  All premium payments were paid by electronic fund transfers from COOK's personal account held at UMB bank.  On June 3, 2022, payment was authorized to Blake Cook as trustee of the Brett Cook Irrevocable Trust.  Payment was made to Blake Cook as trustee of the Brett Cook Irrevocable Trust on June 7, 2022, Farmers NW Life Insurance check number P – 0689641.

67.   Farmers NW Life insurance policy 006704990V was taken out May 14, 2001, and the beneficiary is the Brett Cook Irrevocable Trust.  The face value of the life insurance policy is $150,000.00.  Beginning in 2015, premium payments were made by electronic fund transfers from COOK's personal account held at UMB bank.  On June 3, 2022, payment was authorized to Blake Cook as trustee of the Brett Cook Irrevocable Trust.

Payment was made to Blake Cook as trustee of the Brett Cook Irrevocable Trust on June 7, 2022, from Farmers NW Life Insurance in the amount of $180,730.19.

## CLAIMS FOR RELIEF

### Count One

68.   The Plaintiff repeats and incorporates by reference the paragraphs above.

69.   By the foregoing and other acts, the defendant properties constitute or are derived from proceeds traceable to a violation of Title 18 U.S.C. Section 1341, and therefore, are forfeitable to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C).

### Count Two

70.   The Plaintiff repeats and incorporates by reference the paragraphs above.

71.   By the foregoing and other acts, the defendant properties constitute or are derived from proceeds traceable to a violation of Title 18 U.S.C. Section 1343, and therefore, are forfeitable to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C).

### Count Three

72.   The Plaintiff repeats and incorporates by reference the paragraphs above.

73.   By the foregoing and other acts, the defendant properties were involved in transactions or attempted transactions in violation of Title 18 Sections 1956 or are properties traceable to such a transaction, and therefore, are forfeitable to the United States pursuant to Title 18 United States Code, Section 981(a)(1)(A).

### Count Four

74.   The Plaintiff repeats and incorporates by reference the paragraphs above.

75.   By the foregoing and other acts, the defendant properties were involved in transactions or attempted transactions in violation of Title 18 Section 1957 or are properties traceable to such a transaction, and therefore, are forfeitable to the United States pursuant to Title 18 United States Code, Section 981(a)(1)(A).

WHEREFORE the United States prays that the defendant properties be forfeited to the United States, that the plaintiff be awarded its costs and disbursements in this action, and for such other and further relief as the Court deems proper and just.

UNITED STATES OF AMERICA,

Plaintiff

STEVEN A. RUSSELL

Acting United States Attorney

By:    s/ Kimberly C. Bunjer

KIMBERLY C. BUNJER, #20962
Assistant U.S. Attorney
1620 Dodge Street, Suite 1400
Omaha, NE  68102-1506
Tel:  (402) 661-3700
Fax:  (402) 345-5724
E-mail:  kim.bunjer@usdoj.gov


s/ Mikala Purdy-Steenholdt

MIKALA PURDY-STEENHOLDT
NY#5112289
Assistant U.S. Attorney
1620 Dodge Street, Suite 1400
Omaha, NE  68102-1506
Tel:  (402) 661-3700
Fax:  (402) 345-5724
E-mail:  mikala.purdy-
steenholdt@usdoj.gov

# **VERIFICATION**

I, Ryan Kapsimallis, hereby verify and declare under penalty of perjury that I am a Special Agent with the Internal Revenue Service (IRS) that I have read the foregoing Verified Complaint *in Rem* and know the contents thereof, and that the factual matters contained in paragraphs 1 through 75 of the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent with IRS.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: July 1, 2022.

_____

Ryan Kapsimallis

Special Agent

Internal Revenue Service (IRS)